**Margarita Rose De CUELLAR, Plaintiff,**

v.

**James A. BAKER, as Secretary of the Treasury of the United States, and Manufacturers Hanover Trust Company, Defendants.**

No. 87–1622–Civ.

United States District Court, S.D. Florida.

March 14, 1988.

Alexander Arandia, Coral Gables, Fla., for plaintiff.

Julian Kreeger, Miami, Fla., for Mfrs. Hanover.

Stephen Murphy, Sandra Schraibman, U.S. Dept. of Justice, Washington, D.C., for Government.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ATKINS, District Judge.

THIS CAUSE is before the court on plaintiff's motion for partial summary judgment and on the defendants' cross motions for summary judgment and motions to dismiss. After careful consideration of all submitted papers and after a hearing, it is

ORDERED AND ADJUDGED that the plaintiff's motion for partial summary judgment is GRANTED, and the defendants' motions for summary judgment and motions to dismiss are DENIED.

The plaintiff, a Cuban refugee residing in Florida, was the sole remaining beneficiary of a United States personal trust, the corpus of which consisted of One Hundred Twenty Seven Thousand Dollars ($127,-000.00) principal face amount of Republic of Cuba External Sinking Fund 4½ Bearer Bonds of 1937 due 1977. The bonds were issued in 1937 under an indenture contract between the Republic of Cuba and Manufacturers Hanover Trust ("MHT"). The Republic of Cuba agreed to make payments of principal and interest on the bonds to the indenture trustee, MHT, in trust for the bondholders. Until 1960 when Cuba defaulted on its obligation, all payments were made to the New York offices of MHT, the indenture trustee. MHT currently holds the sinking fund.

On May 12, 1987, the plaintiff filed a petition seeking a specific license authorizing the liquidation and distribution of the assets of the trust. The plaintiff's request was denied by Richard Newcomb, director of the Office of Foreign Assets Control ("OFAC") on July 27, 1987. OFAC found that the Republic of Cuba's contingent reversionary interest[1] was sufficient to sup-

---

1. The indenture contract provided that:

   Six years after the due date of any interest coupon the agent shall return to the Republic the amounts held for the payment of such interest coupons due on that date which shall not have been presented for payment. Similarly, six years after each redemption date, the agent shall return to the Republic the amounts corresponding to those Bonds called for redemption on that date, which shall not have been presented for payment....

   Agreement at ¶ 25.

   At least one court has also found that "Cuba, the 'designated national' has had an interest in the bonds within the meaning of section 515.312, as it is the obligor on these debts, which fall explicitly within the definition of 'property' set out in 31 CFR 515.203(f)." *See Lary v. Republic of Cuba,* 643 F.Supp. 194, 196 (S.D.N.Y.1986). But

port blocking the fund under the Cuban Assets Control Regulations, 31 C.F.R. § 515.201(b). The office characterized Mrs. ·De Cuellar's interest as that of a secured creditor and decided that, since she was not "legally entitled" to her distributive share, she did not qualify under the general license provision of 31 C.F.R. § 515.524.[2] For the purpose of this motion which asserts the applicability of the general license of section 515.524, the court assumes that the transaction in question is prohibited by the regulations and specifically by section 515.201(b).[3]

The plaintiff filed this action challenging OFAC's refusal to apply section 515.524 of the regulations to her transaction, OFAC's refusal to declare the regulations wholly inapplicable to her transaction, and OFAC's refusal to issue a specific license authorizing the transaction.[4] The plaintiff's complaint seeks a declaratory judgment that the Republic of Cuba has no interest in the sinking fund or in the bonds, an order in the nature of mandamus compelling the Secretary of the Treasury to grant the plaintiff a specific license allowing her to redeem her bonds with the corresponding pro rata share of the fund, and an order compelling MHT to comply with the license.

The plaintiff's motion for partial summary judgment alleges that her transaction has been expressly authorized by the general license of 31 C.F.R. § 515.524. This court agrees.

Under Fed.R.Civ.P. 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has interpreted Rule 56(c) as mandating entry of summary judgment after "a sufficient time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Although the moving party bears the burden of informing the court of the basis of its motion, *see id.* 106 S.Ct. at 2553, the opposing party is not relieved of the burden of producing evidence that would support a jury verdict. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), the Supreme Court found that

---

*Lary* did not explore the applicability of the general license of § 515.524 to this fund. That case was concerned with a transfer between holders of the bearer bonds, a transaction that falls squarely within the proscription of § 515.201 and is not excepted by a general license section.

**2.** § 515.801 provides for certain general licenses "authorizing under appropriate terms and conditions, many types of transactions which are subject to the prohibitions contained in Subpart B." Those general licenses are set out in Subpart E of the regulations. § 515.524 is an example of such a general license. It excepts those persons "legally entitled" to a distributive share of a qualified trust.

**3.** § 515.201(b):
All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national

thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidence of indebtedness. . . .

**4.** Specific licenses are controlled by § 515.801(b):
Transactions subject to the prohibitions contained in Subpart B of this part which are not authorized by general license may be effected only under specific license. The specific licensing activities of Foreign Assets Control are performed by the central organization and the Federal Reserve Bank of New York. When an unusual problem is presented, the proposed action is cleared with the Director of the Office of Foreign Assets Control or such person as he may designate.
The regulations provide, however, that it is "the policy of the Office of Foreign Assets Control not to grant applications for speciic licenses authorizing transactions to which the provisions of an outstanding general license are applicable." 31 C.F.R. § 515.801(a).

Rule 56(e) provides that "party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."

The instant case is governed by the Cuban Assets Control Regulations, 31 C.F.R. §§ 515.101–901 promulgated in July of 1963 and authorized first by the Trading with the Enemy Act, 50 U.S.C.App. § 1 *et seq.* and then by the International Emergency Economic Powers Act of 1976, 50 U.S.C. § 1702(a)(1)(B). The plaintiff does not challenge the validity of the regulations.[5] The regulations prevent the transfer of "any property or evidences of indebtedness," *see* § 515.201(b)(1), if such transactions involve "property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever," *see* § 515.201(b), and prohibit all financial and commercial transactions between United States nationals and Cuban nationals without authorization from the Secretary of the Treasury. These regulations, however, contain certain express exceptions or general licenses of which section 515.524 is one. That section reads:

> (a) Any bank or trust company incorporated under the laws of the United States, or of any State, territory, or district of the United States, or any private bank subject to supervision and examination under the banking laws of any State of the United States, acting as trustee of any trust administered in the United States or as legal representative of any estate of an infant or incompetent administered in the United States in which trust or estate one or more persons who are nationals of a designated foreign country have an interest, beneficial or otherwise, or are co-trustees or co-representatives, is hereby authorized to engage in the following transactions:

> (1) Payments of distributive shares of principal or income to all persons legally entitled thereto. . . .

The defendants argue that this section was meant to apply only to private trusts and not to those established by a governmental entity. In addition, they argue that if the trust in question is susceptible to the license authorized by that section, OFAC determined that the plaintiff is not "legally entitled" to her distributive share as required by section 515.524(a)(1) and the fund must remained blocked. The defendants remind the court that the decision of OFAC finding that Mrs. De Cuellar is not "legally entitled" to a distributive share is due great deference and should be reversed only if arbitrary or capricious. *See, e.g., Parker v. Bowen,* 788 F.2d 1512, 1518 (11th Cir.1986) (agency's interpretation of its regulations entitled to great deference).

■ The plain words of section 515.524 belie the defendants' contention that it should be applied only to private trusts. That section excepts "any trust administered in the United States." The sinking fund clearly meets the qualification of a trust administered in the United States. In fact, the parties do not dispute this point. While it is true that the title of the section pertains to "Payment from, and transactions in the administration of *certain* trusts and estates," (emphasis added), the limitation requires that the trust be administered by a "bank or trust company incorporated under the laws of the United States, or of any State . . . or any private bank subject to the supervision and examination under the banking laws of any State of the United States." Hence the movant has satisfied the directive of the Supreme Court in *Celotex,* 106 S.Ct. 2548 by informing this court of the basis for its motion, reliance on section 515.524 because the trust in question is administered in the United States by a qualified bank.

In opposing the plaintiff's motion, the defendants merely assert that "[t]he agen-

**5.** It is well established that the regulations are valid and enforceable. *See, e.g., Dean Witter Reynolds, Inc. v. Fernandez,* 741 F.2d 355 (11th Cir.1984); *Tagle v. Regan,* 643 F.2d 1058 (5th Cir.1981); *Real v. Simon,* 510 F.2d 557 (5th Cir.1975); *Ferrera v. United States,* 424 F.Supp. 888 (S.D.Fla.1976).

894

cy has interpreted this section as applying to private trusts and not to public funds established by foreign government," *see* Defendant James A. Baker's Memorandum in Support of Motion to Dismiss, or in the Alternative for Summary Judgment, and in Opposition to Plaintiff's Motion for Partial Summary Judgment at 6, a "mere allegation[s] or denial[s]" insufficient to prevent entrance of summary judgment. *See Anderson,* 106 S.Ct. at 2514. In fact, in a letter dated July 27, 1987, in which the director of the Office of Foreign Assets Control detailed the rationale behind the rejection of Mrs. De Cuellar's claim, the agency never stated that the trust was not subject to the terms of section 515.524. The basis for OFAC's refusal to apply this section lay in the fact that it characterized Mrs. De Cuellar's interest in the fund as that of a secured creditor, *see* FAC No. 105357 at 3, and stated that such an interest did not place her in the position of one "legally entitled thereto" as required by section 515.524(a)(1).[6] Furthermore, section 515.305 defines designated national for the purposes of the regulations to include "Cuba *and* any national thereof." (emphasis added). Section 515.524(a) excepts any trust in which "one or more persons who are nationals of a designated foreign country have an interest." The regulations in general, and Subpart B in particular, make no distinction between "the designated foreign country or any nationals thereof," and there is no basis to suppose that Subpart E, which generally excepts certain transactions from Subpart B restrictions, would do otherwise, absent an explicit directive.

The philosophy of the regulations does not dictate against application of this general license to this trust. In fact, the trend of current case law supports such an action.[7] The motivation behind promulgation of the regulations has been described as threefold: (1) to deny Cuba and/or its na-

tionals the use of hard currency with which to promote activities inimical to the interests of the United States, (2) to retain blocked funds for possible use by or vesting to the United States, and (3) to employ funds as a basis for negotiation with the Cuban government. *See Tagle v. Regan,* 643 F.2d at 1065 (quoting 55 Cong.Rec. 4858 (1917)); *Real v. Simon,* 510 F.2d 557, 563 (5th Cir.1975) (citing Department of State Press Release 360, July 8, 1963, Dep't of State Bull. 160 (1963)).

It was not suggested that the plaintiff, a Cuban refugee and American resident, intends to employ the funds on behalf of the Cuban government. *See, e.g., Real,* 510 F.2d at 563 (no contention advanced that appellant intended to use the account to benefit Cuba). The plaintiff is a refugee who fled that country over twenty years ago. Nor can it be said that the plaintiff's distributive share may be used by the United States to satisfy claims of Americans against the Cuban government. The Senate Foreign Relations Committee, concerned with the possible appropriation of American owned assets, opined, "if the assets are wholly owned or substantially owned by citizens and residents of United States they should be unblocked, since it is possible that such assets may be placed in a fund at some future date and used to pay the claims of American citizens against the Cuban government. This would be tantamount to using the property of one U.S. citizen to pay the claim of another U.S. citizen." S.Rep.No. 701, 89th Cong., 1st Sess. (1965), U.S.Cong. and Admin. News 1965, pp. 3581, 3585. *See also Tagle,* 643 F.2d at 1066 (no warrant in the Act for any attempt by the Treasury to use assets which properly belong to Americans to compensate other Americans); *Real,* 510 F.2d at 563 (clear direction from Congress of no intent to use property of one Ameri-

6. § 515.524(a)(1) allows payment of distributive shares from a trust qualifying under § 515.524(a) to "all persons legally entitled thereto upon the condition prescribed in paragraph (b) of this section."

7. In *Tagle v. Regan,* 643 F.2d at 1058, 1065 (5th Cir. Unit B 1981) the Fifth Circuit pointed out that "the Trading With the Enemy Act as origi-

nally conceived was designed to cause as little disruption as possible to normal relations with enemy aliens, consistent with the aim of keeping assets out of enemy hands. *There is no suggestion that assets passing to Americans should be restricted in any way.*" (emphasis added).

can to pay another). Thus, neither purpose is served by continued blockage of this fund and the only national interest that may be advanced is use of the Republic's interest by the United States for negotiation purposes.

This court recognizes the importance of providing the President with flexibility in his negotiations with the Cuban government and that Cuba's contingent interest may prove to be a valuable bargaining tool sometime in the future as argued by the defendants. However, the United States may only use those assets that are not the property of American residents because, just as there is no basis for allowing the use of property of one American to pay the claim of another, neither is there a basis for using the property of an American to satisfy the claim of a designated foreign country.

The general license of section 515.524 provides a mechanism through which to satisfy the plaintiff's interest without releasing foreign assets and thereby respecting the goals of the regulations. That section allows "[a]ny payment or distribution of any funds, securities or other choses in action to a national of a designated foreign country under this section shall be made by deposit in a blocked account in a domestic bank in the name of the national who is the ultimate beneficiary thereof." *See* 31 C.F.R. § 515.524(2)(b). Therefore should it be determined that any national of the designated foreign country, Cuba, is entitled to a pro rata distribution, or that Cuba's contingent reversionary interest becomes vested, such payments shall be made into a blocked account pursuant to the mandate of section 515.524(2)(b). The general license of section 515.524 provides the means through which to satisfy the property claims of American residents without threatening the goals of foreign policy.

■ The court now turns its attention to OFAC's determination that Mrs. De Cuellar is not "legally entitled" to her distributive share of the fund and refusal to apply the general license section permitting payment or distribution. This court believes that such a point of view requires an unduly restrictive definition of the term "legally entitled" and does not comport with the spirit of the indenture contract or the legal rights of a holder of bearer bonds. The OFAC would interpret "legally entitled" as meaning that Mrs. De Cuellar must have "legal title" before she comes under the umbrella of section 515.524. *See* FAC. No. 105357 at 4 ("even if your client could be said to acquire legal title"). Legal title is "[o]ne cognizable or enforceable in a court of law, or one which is complete and perfect so far as regards the apparent right of ownership and possession, but which carries no beneficial interest in the property, another person being equitably entitled thereto...." *See* Black's Law Dictionary 1042 (4th ed.1968). The very words of section 515.524 state that it applies to "any trust or estate in which one or more persons who are nationals or a designated foreign country have an interest, *beneficial or otherwise* ..." (emphasis added). The indenture agreement provides that the bonds "constitute irrevocable and indisputable contract obligations," see Agreement at ¶ 7, and that they "shall be entitled to and shall have the benefits of a Sinking Fund sufficient to retire, by redemption or by purchase ... all such bonds...." Agreement at ¶ 12. The more correct interpretation, then, would be to find to "legally entitled" to mean one who has a legal right, a right "created or recognized by law." Black's Law Dictionary 1042 (4th ed.1968). As the holder of bearer bonds, Mrs. De Cuellar has a legal right to enforce the irrevocable, indisputable contract obligations represented by the bonds and is entitled to the pro rata benefits of the Sinking Fund sufficient to redeem those bonds.

Finally, section 515.524 comports with the general philosophy of the regulations which seek only to prevent assets from reaching a hostile government without impairing the property interests of Americans. A device has been fashioned to implement that philsophy, specifically the general license of section 515.524, and it should be employed to its intended purpose when, as here, it may be done without impeding or interfering with foreign policy.

It is true that when reviewing a decision of the Secretary of the Treasury to deny a license to unblock funds, this court's scope of review is narrow. It is limited to a determination of whether OFAC decision was unreasonable, arbitrary, capricious or contrary to law. *Behring International, Inc. v. Miller,* 504 F.Supp. 552, 556 (D.N.J. 1980). OFAC's determination that Mrs. De Cuellar was not "legally entitled" to the distributive share as represented by her bonds was based upon as unreasonable, arbitrary interpretation of "legally entitled" that misconstrues the legal term of art "legal title." The fact that the Trust Indenture did not provide for the vesting of "legal title" in the bondholders is not determinative of whether a bondholder has a legal right to enforce the contractual obligations specifically outlined by the Trust Indenture. This order does not consider OFAC's decision to deny a specific license to the plaintiff because, as noted above, it is OFAC's policy not to grant a specific license to a transaction that is excepted from the regulations by a general license.

For the reasons recited, it is this court's determination that the Sinking Fund is a trust within the meaning of section 515.524 and the plaintiff, Margarita De Cuellar is "legally entitled" to the distributive share as represented by her bonds.