**Margarita Rosa DE CUELLAR, Plaintiff–Appellant,**

v.

**Nicholas F. BRADY as Secretary of the Treasury of the U.S. and Manufacturers Hanover Trust Company, Defendants–Appellees,**

**Margarita Rosa DE CUELLAR, Plaintiff–Appellee,**

v.

**Nicholas F. BRADY as Secretary of the Treasury of the U.S. and Manufacturers Hanover Trust Company, Defendants–Appellants.**

Nos. 88–5606, 88–5667.

United States Court of Appeals, Eleventh Circuit.

Sept. 1, 1989.

---

**6.** Appellants have adopted each other's claims of error. Those claims are rejected.

All pending motions are denied.

Alexander Arandia, Arandia & Perez, New York City, for Margarita Rosa De Cuellar in Nos. 88–5606 and 88–5667.

Anthony J. Steinmeyer, Dept. of Justice, Jay S. Bybee, Washington, D.C., for Secretary of the Treasury of the U.S. in No. 88–5667.

Stephen J. Murphy, III, Anthony J. Steinmeyer and Jay S. Bybee, U.S. Dept. of Justice, Civ.Div., Federal Programs Branch, for Secretary of the Treasury of the U.S. in No. 88–5606.

Christian D. Keedy, Kelley, Drye & Warren, Miami, Fla., for Mfrs. Hanover Trust Co. in Nos. 88–5606 and 88–5667.

Before FAY and HATCHETT, Circuit Judges, and HOFFMAN *, Senior District Judge.

FAY, Circuit Judge:

This appeal presents a novel question concerning the interpretation of the Cuban Assets Control Regulations, 31 C.F.R. Part 515 (1987). The plaintiff, a Cuban refugee residing in the United States, brought this suit seeking a writ of mandamus ordering the Secretary of the Treasury to issue her a license to redeem certain bonds issued by the Republic of Cuba. The Secretary, through the Office of Foreign Assets Control, had denied her application for a license stating that the redemption of her bonds was blocked under the Cuban Assets Control Regulations. The district court held that the sinking fund securing the bond issue qualified as a trust, and the plaintiff was therefore entitled under the Regulations to a general license to redeem the bonds. *De Cuellar v. Baker*, 686 F.Supp. 890 (S.D.Fla.1988). We find that the Secretary's denial of the plaintiff's application was based upon a reasonable interpretation of the Regulations and accordingly we reverse the order of the district court.

I

The statutory basis for the Cuban Assets Control Regulations ("the Regulations") is the Trading with the Enemy Act ("the Act"), 50 U.S.C.App. § 1 *et seq*. Section 5(b) of the Act provides in part:

During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate ...

(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution ... and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use,

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest....

In 1977 Congress amended § 5(b) so that its applicability no longer extended to national emergency situations during peacetime. Act of December 28, 1977, Pub. L.No. 95–223, 91 Stat. 1625 (1977).[1] Section 101(b) of the Act however, contained a grandfather clause such that economic measures taken pursuant to § 5(b) prior to 1977 could be continued. "The President may extend the exercise of such authorities for one-year periods upon a determination ... [that such] extension ... is in the national interest of the United States." The Regulations have been extended each year.

In 1963 President Kennedy issued an embargo on all trade with Cuba. Under the authority given to him under the embargo, the Secretary of the Treasury promulgated the Cuban Assets Control Regulations on July 8, 1963. 31 C.F.R. Part 515. The Regulations prohibit all transactions that "involve property in which a foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 515.201(a)(1). Cuba is a designated national. 31 C.F.R. § 515.305.

Notwithstanding the general prohibition of § 515.201, Subpart E of the Regulations provides for the issuance of general licenses upon application to the Secretary, by which an individual may be permitted access to property otherwise blocked by the Regulations. Persons who do not qualify under one of the general license provisions may apply for a specific license to be issued at the discretion of the Secretary. 31 C.F.R. § 515.801. Section 515.524, under Subpart E, provides, in part, as follows:

(a) Any bank or trust company incorporated under the laws of the United States, or of any State, territory, or district of the United States, or any private bank subject to supervision and examination under the banking laws of any State of the United States, acting as trustee of any trust administered in the United States or as legal representative of any estate of an infant or incompetent administered in the United States in which trust or estate one or more persons who are nationals of a designated foreign country have an interest, beneficial or otherwise, or are co-trustees or co-representatives, is hereby authorized to engage in the following transactions:

(1) Payments of distributive shares of principal or income to all persons legally thereto upon the condition prescribed in paragraph (b) of this section.

## II

The plaintiff Margarita Rosa De Cuellar is the sole remaining beneficiary of a United States personal trust established in 1936 by her mother. The trust consists of 133 "Republic of Cuba External Sinking Fund 4½% Bearer Bonds" with a face value of $127,000. The bonds were issued in 1937 under an indenture contract between the Republic of Cuba and Manufacturers Hanover Trust ("MHT"). Under the indenture agreement ("the Agreement"), Cuba was to retire the bond series through annual payments of principal and interest to a sinking fund held by the indenture trustee, MHT, from 1938 through 1977. As trustee, MHT was responsible for redeeming these bearer bonds upon their maturity with the funds accumulated in the sinking fund.

The Agreement also provided that once the bonds matured in 1977, bondholders had six years to redeem the bonds or "the Agent shall return to the Republic the amounts corresponding to the remaining Bonds which, not having been redeemed nor purchased, should have been paid on June 30, 1977 and shall not have been presented for payment." Agreement ¶ 25.

---

1. The President's power to take economic measures in peacetime is now governed by the International Emergency Economic Powers Act. Pub.L. 95–223, § 201 et seq., 91 Stat. 1626 (codified in 50 U.S.C. §§ 1701 *et seq.*), which permits presidential action with respect to foreign property in an emergency declared by the President.

Under the Agreement, the bonds were secured by "the pledge of [Cuba's] good faith and credit," and by "a first preferential right and lien" on 90% of Cuba's tax revenues and economic resources. The pledge of tax revenues and resources was secure "[s]o long as any of the bonds of this issue shall remain outstanding." Agreement ¶ 7. The bonds were payable in full at their maturity in June 1977, however in the event that there were insufficient funds in the sinking fund, MHT was to distribute the funds pro rata. Agreement ¶ 21.

Cuba made its required payments to the sinking fund until December 31, 1960, when it defaulted. On July 8, 1963, the sinking fund was blocked pursuant to the Cuban Assets Control Regulations. As of that date MHT, the paying agent, held $640,098 in the sinking fund. (R3–65–1).

On May 12, 1987, the plaintiff filed a petition with the Secretary seeking a specific license authorizing her to redeem her bonds with her distributive share of the sinking fund. Her request was denied by Richard Newcomb, the Director of the Office of Foreign Assets Control ("OFAC").[2] The Director stated that the sinking fund was blocked because the Republic of Cuba retained a contingent reversionary interest in the fund.[3] He also stated that De Cuellar was in no sense an owner of the sinking fund, but rather was in the position of a secured creditor. Thus the Director concluded that De Cuellar did not qualify for the general license of § 515.524 which acts to release the contents of a trust, otherwise blocked under the Regulations, to persons "legally entitled thereto." (R1–1–Ex. C).

On September 1, 1987, De Cuellar filed suit against James Baker as Secretary of the Treasury, and MHT, challenging the Secretary's refusal to (i) issue a specific license unblocking her trust interest; (ii) declare the Regulations inapplicable to her transaction; and (iii) apply General License § 515.524 of the Regulations to her transaction.[4] In her complaint, De Cuellar sought a declaratory judgment that the Republic of Cuba has no interest in the sinking fund or in the bonds, an order compelling the Secretary to grant the plaintiff a specific license allowing her to redeem her bonds with her pro rata share of the fund, and an order compelling MHT to comply with the license.

On cross-motions for summary judgment, the district court held that the trust fund qualified under 31 C.F.R. § 515.524 for a general license and that Mrs. De Cuellar was " 'legally entitled' to the distributive share as represented by her bonds." De Cuellar, 686 F.Supp. at 896. The court began with the assumption that the transaction at issue was prohibited by § 515.201(b) of the Regulations because of Cuba's interest in the sinking fund. Id. at 892. Next, the court rejected the Secretary's argument that the General License Section should apply only to private trusts, stating that "[t]he plain words of section 515.524 belie [this] contention.... The sinking fund clearly meets the qualification of a trust administered in the United States." Id. at 893. The court further found that the "philosophy of the regulations does not dictate against application of this general license to this trust." Id. at 894. Finally, the court ruled that the Secretary's determination that Mrs. De Cuellar is not "legally entitled" to her distributive share of the fund "requires an unduly restrictive definition of the term ... and does not comport with the spirit of the indenture contract or the legal rights of a holder of bearer bonds." Id. at 895. The term "le-

---

**2.** The President has delegated his authority under the Act to the Secretary of the Treasury, Exec. Order No. 9193, 3 C.F.R. 1174, 1175 (1942), who in turn delegated that authority to the Office of Foreign Assets Control, Treasury Department Order No. 128 (Rev. 1, Oct. 15, 1962).

**3.** The indenture contract provides:
Six years after the due date of any interest coupon the Agent shall return to the Republic the amounts held for the payment of such interest coupons due on that date which shall not have been presented for payment. Similarly, six years after each redemption date, the Agent shall return to the Republic the amounts corresponding to those bonds called for redemption on that date, which shall not have been presented for payment....
Agreement at ¶ 25.

**4.** Nicholas Brady, the new Secretary of the Treasury, is automatically substituted for James Baker as defendant. Fed.R.App.P. 43(c)(1).

gally entitled," the court stated, does not apply only to one who holds legal *title*, as the Secretary argues, but rather to anyone "who has a legal right, a right 'created or recognized by law.'" *Id.* (citation omitted).

The district court granted partial summary judgment for Mrs. De Cuellar. Two days later the court determined that the partial summary judgment order rendered the remaining issues moot, and entered final judgment for the plaintiff. The Secretary filed a request for a stay pending appeal and a motion for clarification, stating that it was not clear whether the court had entered an injunction against the Secretary. Mrs. De Cuellar requested a ruling that she was entitled to full redemption of her bonds, rather than merely her pro rata share of the fund. On April 15, 1988, the district court granted the Secretary's motion for clarification, announced that the court's prior order was a declaratory judgment, and issued a stay pending appeal. On May 20, the court denied Mrs. De Cuellar's motion without prejudice.

■ Consideration of the district court's grant of summary judgment requires plenary review and application of the same legal standards that bound the district court. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1527 (11th Cir.1987). Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus the Supreme Court has held that Rule 56(c) mandates the entry of summary judgment against a party who has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The decision of the OFAC is entitled to great deference, and should be reversed only if arbitrary or capricious. *Behring International, Inc. v. Miller*, 504 F.Supp. 552, 556 (D.N.J.1980). *See Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir.1986). Where Congress has not specifically addressed the precise question at issue, "the

question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Consequently, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. at 2782; *see Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

We will address first, whether Cuba could be held to have an interest in the sinking fund under § 515.201(b); second, whether the plaintiff is entitled to a general license under § 515.524; and third, whether the Secretary's interpretation of the Regulations comports with the purposes of the Act.

### III

Because Mrs. De Cuellar's motion for partial summary judgment asserts the applicability of general license § 515.524, the district court began with the assumption that "the transaction in question is prohibited by the regulations and specifically by section 515.201(b)." *De Cuellar*, 686 F.Supp. at 892. De Cuellar argues, however, that we need not reach the issue of whether the general license section applies to this transaction because Cuba has no interest in these assets sufficient to block the sinking fund under § 515.201(b). Thus, she argues, the Secretary should have declared the Regulations wholly inapplicable to her transaction.

■ Section 515.201(b) of the Regulations provides as follows:

All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section *had any interest*

*of any nature whatsoever, direct or indirect;*

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness....

(emphasis supplied). The Secretary asserts that Cuba's contingent reversionary interest in the sinking fund (Agreement at ¶ 25) is sufficient to trigger application of this section to the transaction in question.[5] The plaintiff does not dispute that Cuba has a reversionary interest in the sinking fund under the express terms of the indenture. She nonetheless argues that the reversionary interest does not extend to that portion of the fund to which *she* claims to be entitled, and that the Regulations therefore require the Secretary to unblock her distributive share.

We believe that the Secretary's interpretation of § 515.201(b) is well supported by the language of the Agreement, the intent of the parties to the contract, and the relevant case law. In *Nielsen v. Secretary of Treasury*, 424 F.2d 833 (D.C.Cir.1970), the court refused to require the Secretary to unblock the three-fourths of the stock of a Cuban corporation with assets in the United States owned by three Cuban refugees. In upholding the Secretary's decision, the court stated:

> [I]t is at least presumptively acting reasonably, and without being subject to the charge of arbitrary or tyrannical action, if it assumes that assets owned by a Cuban corporation are indeed assets in which there is a Cuban national interest.
>
> The reasonableness of this approach is heightened by the possibility, perhaps the likelihood, that the foreign country will assert an interest in the assets of corporations organized under its laws.... It is not unreasonable for the American authorities to treat the property of a Cuban corporation as a matter of Cuban interest and concern, when this and future Cuban governments are likely, with some support in fundamental

legal principles, to assert such an interest.

*Id.* at 842. The assets in the case before us lie in a sinking fund set up to secure negotiable bonds issued by the Cuban government. We see no reason why the individual shares of that fund are in any sense more divisible than are the separately held shares of a Cuban corporation.

In *Behring Intl., Inc., v. Miller*, 504 F.Supp. 552 (D.N.J.1980), the Iranian Air Force and Iran Aircraft Industries owed substantial sums to the plaintiff for warehouse services provided in the United States. The parties eventually reached a settlement agreement, under which Iran placed money in a trust account which would be paid to the plaintiff upon release of certain Iranian property from the warehouse. Any of the money remaining in the account after payment to the plaintiff was to be returned to Iran. Before the Iranian property was released, the President issued an executive order blocking all property and interests of the Iranian government and its instrumentalities. The plaintiff obtained a partial license from the Secretary, but sued to force the Secretary to license the release of the balance of the money owing to him, alleging that Iran had no interest in the funds held in trust. The court held that although the interest of Iran in the trust may be "contingent or de minimus" the

> residual amount, in which Iran has an interest pursuant to the terms of the Agreement, has not been determined. Being undetermined, the amount in which Iran has an interest *may not be severed from the plaintiff's interest in the account.* The account represents an asset in which both parties have an interest. As such, the account remains blocked in accordance with the Executive Order and the regulations promulgated thereunder.

*Behring,* 504 F.Supp. at 557 (emphasis supplied). Like *Nielsen, Behring* lends strong

---

**5.** The Secretary also asserts that Cuba has an interest in the sinking fund by virtue of its status as issuer and obligor of the bond issue. *See Lary v. Republic of Cuba,* 643 F.Supp. 194, 196 (S.D.N.Y.1986). Because we find that

Cuba's contingent reversionary interest under the indenture contract is an "interest" within the meaning of § 515.201(b), we express no opinion as to the alternative grounds raised by the Secretary.

support for the decision of the Secretary not to permit the piecemeal unblocking of the sinking fund in which the Republic of Cuba has an undisputed reversionary interest.

Mrs. De Cuellar cites *Tagle v. Regan,* 643 F.2d 1058 (5th Cir.1981) and *Real v. Simon,* 510 F.2d 557 (5th Cir.1975) as support for the broad proposition that under the Act, "[t]here is no suggestion that assets passing to Americans should be restricted in any way." *Tagle,* 643 F.2d at 1065. In *Real,* the Secretary blocked an account which had been established by the decedent, a Cuban national. The account passed to the decedent's heirs, who were citizens or residents of the United States, by intestate succession. In blocking the account, the Secretary relied on 31 C.F.R. § 515.327 (1974), which defines a "blocked estate of a decedent." This section blocks any estate "in which a designated national has an interest," and goes on to state that "[a] person shall be deemed to have an interest in a decedent's estate if he ... was the decedent...." The district court entered judgment in favor of the government. The court of appeals reversed, holding that the government could not validly determine under the Act that a deceased person retains an interest in his estate, and that such a determination "is arbitrary and without basis in either the language or the purpose of the Trading with the Enemy Act." *Real,* 510 F.2d at 564. The court was careful to point out that "[t]here is no contention by the United States that the Cuban government has any right or claim to this property, nor is there any assertion that any person in Cuba has any interest in the property." *Id.* at 561. "If neither the government of Cuba nor any person in Cuba has any interest or claim to the blocked property, the Trading with the Enemy Act would be inapplicable...." *Id.* at 562.

In *Tagle,* the court again addressed the scope of the Secretary's power to block the passing of a decedent Cuban national's property to American heirs through intestate succession. In *Tagle* however, unlike *Real,* one of the three surviving heirs was a resident of Cuba. The court held that the plaintiffs, who were the two heirs residing in the United States, should be issued a license to unblock their intestate shares. Because the plaintiffs' intestate shares could be "sufficiently separated and identified," the court found that § 515.525, which under *Real* authorizes the transfer of the estate of a Cuban national by intestate succession, would allow the plaintiffs to take their shares even though the share of the Cuban heir remained blocked.

*Tagle* and *Real* provide relevant discussions of the latitude to be allowed the Secretary in effectuating the goals of the Act. However, we disagree with the district court that these cases reflect a general "trend of current case law" toward the unblocking of accounts in which Cuba retains an interest, *De Cuellar,* 686 F.Supp. at 894; much less do we find them dispositive of the case before us. Both cases involved estates passing through intestate succession pursuant to specific provisions of the Regulations. All of the heirs were known and their shares were fixed by operation of law. By contrast, the plaintiff here seeks to redeem negotiable bearer bonds with funds from an account in which Cuba has an undisputed reversionary interest.[6] Furthermore, it is uncertain how many of the bearer bonds remain outstanding and thus the plaintiff's distributive share with respect to the other bondholders is undetermined. Thus, we decline to disturb the Secretary's determination that Cuba has an interest in the sinking fund sufficient to block the entire fund under § 515.201(b).

IV

Section 515.524 provides a general license for certain trusts and estates in which Cuban nationals have an interest and which are administered by United States

---

6. We note also that were we to order the unblocking of the sinking fund it would be difficult, if not impossible, to determine if particular bearer bonds held by unknown claimants and presented for redemption have been transferred by Cuba or Cuban nationals to American nationals. This scenario is precisely what the Regulations were designed to prevent. *See Ferrera v. United States,* 424 F.Supp. 888, 890 (S.D.Fla. 1976); *Tagle,* 643 F.2d at 1068.

banks or trust companies. The Director of OFAC states that § 515.524 has "always been interpreted by Treasury to apply to private trusts and estates. To the best of my knowledge, the Treasury Department has never approved under this section an unblocking of assets ... in circumstances resembling those described in plaintiff's complaint." (R2–32 at 5). The district court however rejected the distinction drawn between private trusts and a trust indenture used to secure a public bond issue, holding that "[t]he sinking fund clearly meets the qualification of a trust administered in the United States." *De Cuellar*, 686 F.Supp. at 893.

The Secretary argues that there are obvious and important differences between private trusts and trust indentures. Among these, while a trustee holds equitable title to the trust corpus, "the debenture indenture trustee does not hold title to, or have possession of, any property." *Broad v. Rockwell International Corp.*, 642 F.2d 929, 941–42 n. 13 (5th Cir.) (en banc), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (*quoting* American Bar Foundation, Commentaries on Indentures 7–8 (1971)). In this case, the indenture agreement itself demonstrates that MHT in many respects stands in a position distinct from that of a private trustee. For example, MHT is wholly without discretion over the management of the assets of the sinking fund, and in fact does not hold legal or equitable title to these assets. As indenture trustee, MHT functions largely as a paying agent for the parties to the bond contract and its responsibilities are determined by the terms of the Agreement. As the Secretary points out, the ultimate security for the bonds is 90% of Cuba's tax revenues, which security remains in possession of the Republic of Cuba. The reasonableness of the Secretary's interpretation of § 515.524 is further demonstrated by an examination of the entire regulatory scheme concerning the licensing of blocked transactions. When viewed in context, it makes perfect sense that the Secretary has refused to extend the reach of § 515.524 to an indenture trust such as the one held by MHT.

The Regulations license certain transactions involving securities blocked because they are owned by Cuban nationals, but they specifically exclude any transaction in which the government of Cuba issued the securities. 31 C.F.R. § 515.514(e). There is no question that the bonds issued by Cuba in this case are securities.[7] Thus, under the plain meaning of § 515.514(e) Cuba is prohibited form making any payments or transfers on the bonds it has issued since they are securities issued by Cuba.

The plaintiff urges that the general license provision of § 515.524 pertaining to "certain trusts" applies to the sinking fund and requires the unblocking of her distributive share despite the fact that the bonds she holds are securities within the meaning of § 515.514. We are convinced that the Secretary has properly interpreted the Regulations to reject this argument. To hold that § 515.524 requires that the Secretary license the redemption of the bond issue would contradict the plain meaning of § 515.514 in that it would permit the transfer of securities specifically prohibited by § 515.514 merely because Cuba happened to secure the bonds with a trust. Thus, if the district court's interpretation was correct, all transactions involving securities issued by Cuba would be blocked, except for those in which Cuba chose, for whatever reason, to employ a trust to secure them. In this case, the Secretary chose to interpret his own regulations to avoid such an anomalous result, and we are unable to agree with the district court that this interpretation is arbitrary and capricious. We do not here hold that the sinking fund does not qualify as a trust as a matter of law. However, we do believe that the distinction drawn by the Secretary between private trusts and trust indentures under § 515.524 is reasonable and thus his refusal to grant the plaintiff a general license under this section was proper.

7. Section 515.203(f) of the Regulations defines "securities" by reference to section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), which define that term to include any "bond, debenture, [or other] evidence of indebtedness."

## V

■ Finally, we believe that the Secretary's disposition of the plaintiff's petition is consistent with the purposes behind the Trading with the Enemy Act and the Cuban Assets Control Regulations. The main purposes of the Regulations have been described as: (1) To deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States; (2) To retain blocked funds for possible use or vesting to the United States should such a decision be made; and (3) To use blocked funds for negotiation purposes in discussions with the Cuban government. *Real*, 510 F.2d at 563. The first purpose, to deny Cuba hard currency, is fully vindicated by the Secretary's decision because the sinking fund is one in which Cuba has a reversionary interest. As for the second stated purpose, the continued blocking of the fund preserves the possibility that the United States might vest blocked Cuban assets in order to pay the claims of Americans against Cuba. As the Second Circuit noted in *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 112 (2nd Cir.), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966), "[t]here is a long history of governmental action compensating our own citizens out of foreign assets in this country for wrongs done them by foreign governments abroad." For example, the United States negotiated a settlement with Iran in 1981 under which attachments of Iranian assets by United States citizens were suspended. These assets were used to create a fund to compensate parties with claims on the assets. Those whose attachments had been suspended sought relief in the Iran–U.S. Claims Tribunal. This action was upheld in *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

The district court rejected the legitimacy of the use of the sinking fund for possible vesting by the United States because it was concerned with the propriety of using the plaintiff's distributive share "to satisfy claims of [other] Americans against the Cuban government." *De Cuellar*, 686 F.Supp. at 894. While we agree with the broad proposition that the government may not normally use the property of one American citizen to satisfy the claims of another, *Tagle*, 643 F.2d at 1066; *Real*, 510 F.2d at 563, there is little historical basis for fear that this will occur. For example, after World War II the United States vested private Bulgarian, Hungarian, and Rumanian property pursuant to settlements with those countries. The settlement provided that debts owed to certain categories of United States citizens be paid first. *See* 22 U.S.C. § 1631g(a). Payments of general claims against these countries were allowed out of the remaining funds. *See* 22 U.S.C. § 1641a *et seq.*

Finally, the continued blocking of the sinking fund and Cuba's contingent interest in it provides an important bargaining tool for negotiations with the Cuban government. *See Dames and Moore v. Regan*, 453 U.S. 654, 673, 101 S.Ct. 2972, 2983, 69 L.Ed.2d 918 (1981). As the Supreme Court explained in *Dames and Moore*, "[n]ot infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns. To resolve these difficulties, nations have often entered into agreements settling the claims of their respective nationals." *Id.* at 679, 101 S.Ct. at 2986 (citation omitted).[8] It is the opinion of the Secretary that the best hope that the bondholders and other of Cuba's creditors have of collecting on debts owing to them lies in the execution of a single, negotiated settlement between the United States and Cuba. The OFAC Director explained that it has been a consistent policy to keep "all Cuban assets blocked, pending a decision or settlement regarding all claims against Cuba. Eventually, all blocked assets will be disposed of in accordance with an overall plan that may

---

**8.** *See also Nielsen*, 424 F.2d at 840 ("The freeze on transfer of Cuban assets was not necessarily, however, a freeze on American policy concerning the future of those assets.... [T]he freeze of the assets of a foreign country may not only promote economic isolation in the present, but also constitute meaningful planning for the future, by preserving the assets involved for possible use in some satisfaction of American claims against the country involved....").

provide for the claims of individual creditors of Cuba." (R2–32 at 5, 6).

The district court stated that the plaintiff's interest could nonetheless be satisfied "without impeding or interfering with foreign policy." *De Cuellar*, 686 F.Supp. at 895. Section 515.524(2)(b) provides a mechanism by which any funds due Cuba or Cuban nationals may be paid into a blocked account. Thus, the district court suggests that the plaintiff, and presumably other non-Cuban nationals, could be granted individual licenses to redeem their bonds without effectively unblocking the entire fund. We believe, however, that the Secretary's chosen approach of holding all assets until a single, comprehensive settlement with the Cuban government can be reached is entitled to great deference from this court. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).[9] Were the Secretary forced to follow the course prescribed by the district court, "[t]he sinking fund and other similar assets could be dissipated to such a degree that they could become useless as a tool for negotiating with the Cuban government." (R2–55 at 2). Thus, we find that the decision of the Secretary is fully consistent with the furtherance of the goals of the Act as implemented by the Regulations.

Accordingly, the district court's order granting partial summary judgment for the plaintiff, and the final judgment for the plaintiff are reversed, and the matter is remanded to the district court for entry of judgment in favor of the defendants.

REVERSED, REMANDED and RENDERED.

---

**9.** Under the plain wording of the Agreement, were Mrs. De Cuellar granted a license to unblock her interest in the sinking fund, she would be entitled only to her pro rata share. The Agreement expressly addresses the contingency of insufficient funds by providing for the redemption of outstanding bonds upon maturity "in full if [the] funds suffice therefor, *otherwise pro rata*." Agreement ¶ 21 (emphasis supplied).

Of the $85 million face amount of the bond series, the sinking fund currently contains about $1.5 million. (R3–65–2). Thus, by unblocking the sinking fund now rather than using Cuba's interest in the fund to negotiate a favorable comprehensive settlement, the bondholders' pro rata shares would comprise no more than a mere fraction of their respective claims against the fund.