**Ramon CERNUDA and Editorial Cernuda, Inc., Petitioners,**

v.

**George D. HEAVY, Regional Commission, United States Customs Service, and Department of Treasury, United States Customs Service, Respondents.**

No. 89–1265–Civ.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 18, 1989.

Charles V. Senatore, Frank Burt, Tew, Jorden Schulte & Beasley, Miami, Fla., for petitioners.

Dexter W. Lehtinen, U.S. Atty., Thomas A.W. Fitzgerald, Asst. U.S. Atty., Miami, Fla., for respondents.

## ORDER GRANTING PETITION FOR RETURN OF SEIZED PAINTINGS

RYSKAMP, District Judge.

### I. INTRODUCTION

THIS MATTER is before the court on a petition filed June 19, 1989, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, seeking the return of approximately 200 paintings and other property seized by the U.S. Customs Service ("the Service") on May 5, 1989.[1] The court heard argument on that petition on July 28, 1989.

For the reasons discussed below, the petitioners' petition for return of the seized property is hereby GRANTED.

### II. FACTUAL BACKGROUND

The Service seized the aforementioned property as being violative of the Trading With the Enemy Act, 50 U.S.C.A.App. § 5(b) (1968 and Supp.1989) ("the TWEA"), and the Cuban Asset Control Regulations promulgated thereunder, 31 C.F.R. Pt. 515 (1963, amended 1989) ("the Regulations").

This seizure is part of an on-going controversy surrounding the exhibition and auction of Cuban art organized by the Cuban Museum in Miami. *See generally* Memorandum of Law in Support of Petition for Return of Property Pursuant to Rule 41(e), Federal Rules of Criminal Procedure ("Petitioners' Memorandum") at 5–11; Appendix 2; Appendix 8. Petitioner Cernuda has served the museum in various executive capacities during the last eleven years. Beginning in late 1987, dissension arose among museum directors and in the community concerning the museum's exhibition and auction of art created by artists now living in Cuba or those who have not renounced allegiance to Fidel Castro.

The dissension focused on a benefit auction planned for April 1988, which was to include such art. Those opposing the auction suggested that it would violate the TWEA, at which point auction organizers withdrew the disputed art to avoid any possible legal violations. *Id.* at 8.

Despite withdrawal of the works from the auction, the controversy continued regarding the museum. Cernuda and other museum directors were the subject of death threats. A bomb exploded on May 3, 1988, damaging a director's car and the museum itself. Seventeen incumbent board members, opposed to the museum's dealings in art associated with Castro's Cuba, also resigned that month. Because of the controversy, the museum was subjected to city and state audits, which failed to uncover financial impropriety. Nevertheless, the Florida Legislature withdrew its financial support for the museum on May 18, 1988.

---

[1] Of the approximately 200 paintings seized, thirty-two were returned to petitioners on July 24, 1989. *See* Reply to Government's Response to Motion for Return of Property, Affidavit of Ramon Cernuda, para. 7.

After the April 1988 auction, petitioners attempted to comply with the TWEA by seeking licenses to exhibit Cuban works. Thus, in December 1988, Cernuda wrote to the Office of Foreign Asset Control ("OFAC"), the federal agency responsible for enforcing the TWEA, requesting permission to exhibit the work of a Cuban dissident artist. OFAC never responded to this request. *Id.* at 13.[2]

The next contact Cernuda had with government officials was on May 5, 1989, when agents of the U.S. Customs Service searched his personal residence and the office of his company, Editorial Cernuda, pursuant to duly executed warrants. The agents seized approximately 200 paintings that appeared to be of Cuban-origin.[3] This seizure is the subject of this petition.

At present, the government has issued no criminal indictments against petitioners for TWEA violations surrounding the importation of the disputed paintings, although more than four months have passed since its agents seized the paintings.[4] Nonetheless, Rule 41(e) gives this court the

---

**2.** After the May 1989 seizure, Cernuda requested a retroactive license for his paintings, as provided in 31 C.F.R. §§ 515.203(c), 515.502. *See* Petitioners' Memorandum at 14. This request also went unanswered. *See infra* at page 1552.

**3.** The government and petitioners disagreed as to whether all paintings seized were subject to the Cuban embargo, and the government retained an art expert to analyze the disputed works. *See* Government's Memorandum at 2 n. 2. Nearly two months after the seizure, the government returned thirty-two paintings to petitioners. *See supra* note 1. According to petitioners, the government's return of certain of these paintings was inconsistent with its asserted stance on the TWEA. *See* Reply to Government's Response to Motion for Return of Property, Affidavit of Ramon Cernuda, para. 7. After this decision, further appraisal of petitioners' paintings will be unnecessary.

**4.** It is unclear whether those people who actually imported the disputed paintings will be prosecuted. The government admits that its year-long investigation revealed that petitioner Cernuda did not himself purchase the paintings from anyone in Cuba. *See generally* Government Memorandum at 3; Petitioners' Memorandum at 3 n. 3. Cernuda purchased a small number of paintings from Jerry Scott, a United States Public Affairs officer formerly based in Havana. Scott brought the paintings into the

---

discretion to hear pre-indictment requests for the return of unconstitutionally seized property. *See DiBella v. United States,* 369 U.S. 121, 131, 82 S.Ct. 654, 660, 7 L.Ed.2d 614, 621 (1962); *Richey v. Smith,* 515 F.2d 1239, 1243 (5th Cir.1975).

## III. THE STATUTORY AND REGULATORY FRAMEWORK

### A. *The Trading With the Enemy Act Before Its 1988 Amendment*

The Trading With the Enemy Act, 50 U.S.C.A.App. § 5(b), originally provided the President with broad authority to impose comprehensive embargoes on commerce with foreign countries, during both peacetime emergencies and wartime. Trading With the Enemy Act of 1917, ch. 106, 40 Stat. 411 (amended 1977, 1988); *Regan v. Wald,* 468 U.S. 222, 225–26, 104 S.Ct. 3026, 3029, 82 L.Ed.2d 171, 175–76 (1984).

In 1977, Congress amended section 5(b) so that it no longer applied to emergency situations during peacetime. Act of December 28, 1977, Pub.L. No. 95–223, 91

---

United States in February 1988, without declaring them to U.S. Customs inspectors. Cernuda also purchased various Cuban paintings from Guido Adriaenssens, a Belgian diplomat, in May and November 1987, also without obtaining prior Treasury approval. Adriaenssens brought approximately 120 pieces of Cuban art into the United States between 1980 and 1983.

Thus, the record reveals that Cernuda's dealings in Cuban art were purely domestic transactions and that he did not himself "trade with the enemy." The government maintains that the TWEA prohibits even such secondary commercial transactions, in order to prevent a domestic market from developing "which is likely to fuel illicit importation and stymie enforcement efforts." Government's Memorandum at 20 n. 13.

But the government seeks to quash this domestic market through selective enforcement. Cernuda is the only art dealer subjected to government seizure of his collection. The directors of Latin American art for the New York auction houses of Sotheby's and Christie's claim they never acquired licenses to auction works by Cuban artists before this controversy arose. Petitioner's Memorandum at 11 and Appendix 15. In the last seven years, these two houses have sold approximately 900 such paintings. *Id.* at 11 and Appendix 6. The Modern Art Museum at the Organization of American States in Washington, D.C., also exhibited the works of Cuban artists. *Id.* at 12 and Appendix 6.

Stat. 1625 (1977). But the 1977 amendment contained a grandfather clause, which allowed for the continuation of economic measures taken pursuant to section 5(b) before 1977. *See De Cuellar v. Brady*, 881 F.2d 1561, 1562–63 (11th Cir.1989).[5]

Pertinent to the present case, the TWEA was the basis for a 1962 embargo on all trade with Cuba after the ascendancy of Fidel Castro. *See* Proclamation 3447 of Feb. 3, 1962, 27 Fed.Reg. 1085 (1962), 3 C.F.R. 1959–1963 Comp., p. 157. Under authority provided by the embargo, the Secretary of the Treasury promulgated the Cuban Assets Control Regulations to aid in enforcing the TWEA. 31 C.F.R. Pt. 515 (1963). The Regulations generally prohibited any "dealings" in property in which a Cuban national has, or had, a direct or indirect interest after July 8, 1963, in order to prevent the transfer of wealth to Cuba. *See* 31 C.F.R. § 515.201 (general prohibition as to certain countries and nationals); § 515.305 (Cuba designated as national under TWEA); *see also Tagle v. Regan*, 643 F.2d 1058, 1059 (5th Cir.1981) (generally describing Regulations applicable to TWEA as amended in 1977).

Notwithstanding the general prohibition of section 515.201, the Regulations prior to 1988 provided for general licenses by application to the Secretary in Subpart E and for specific licenses at the Secretary's discretion in Subpart B. *See* 31 C.F.R. § 515.801(a), (b). Subpart E provided that a general license could be obtained for the importation of "[b]ooks and other publications, films, phonograph records, tapes, photographs, microfilm, microfiche and posters of Cuban origin." 31 C.F.R. § 515.545. Imports of these materials for educational purposes had to be approved by the Librarian of Congress or the National Science Foundation, while similar imports for commercial purposes were allowed if the licensee deposited funds into a blocked account and filed certain reports. *Id.* § 515.545(a), (b). If the Regulations did not provide for a general license, an individual could seek a specific license through either OFAC or the Federal Reserve Bank of New York. *Id.* § 515.801(b).

### B. *The TWEA After Its 1988 Amendment*

*1. Statutory Language.* In 1988, Congress passed the Omnibus Trade and Competitiveness Act, which amended TWEA section 5(b) by adding new section 5(b)(4). *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2502(a)(1), 1988 *U.S. Code Cong. & Admin.News* (102 Stat.) 1107, 1371 (codified at 50 U.S.C.A.App. § 5(b)(4) (Supp.1989)). This 1988 amendment expressly revoked presidential authority to regulate or prohibit the importation or exportation of certain materials. In pertinent part, it provides that:

> The authority granted to the President in this subsection does not include the authority to regulate or prohibit, directly or indirectly, the importation from any country, or the exportation to any country, whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, or other informational materials, which are not otherwise controlled for export under section 5 of the Export Administration Act of 1979 [section 2404 of this Appendix][6] or with respect to which no acts are prohibited by chapter 37 of title 18, United States Code.[7]

*2. Legislative History.* The Omnibus Trade and Competitiveness Act of 1988, which amended the TWEA, was not itself the subject of legislative debate, as it was derived largely from a predecessor bill vetoed because it included a subtitle relating to plant closings. *See* 1988 *U.S. Code Cong. & Admin.News* 1547. Nevertheless,

---

**5.** Presidential power to take peacetime economic measures that do not fall under the grandfather clause of the 1977 amendment are governed by the International Emergency Economic Powers Act, Pub.L. No. 95–223, §§ 202 et seq., 91 Stat. 1626 (codified in 50 U.S.C. §§ 1701 et seq.) (1977, amended 1988) ("the IEEPA"). *See De Cuellar*, 881 F.2d at 1563 n. 1.

**6.** Section 2404 allows the President to prohibit or curtail the export of goods or technology to protect U.S. national security. 50 U.S.C.A.App. § 2404 (1951 and Supp.1989).

**7.** Chapter 37 enumerates crimes involving espionage and the disclosure of classified information. *See* 18 U.S.C.A. §§ 792–799 (1976 and Supp.1989).

the 1988 act specifically provides that the legislative history for the predecessor bill, H.R. 3, generally is treated as its own legislative history.[8] Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2, 1988 *U.S.Code Cong. & Admin.News* (102 Stat.) 1107, 1119.

Unfortunately, the conference report for H.R. 3 provides little insight as to the interpretation of amended TWEA section 5(b)(4), beyond the bare words of the statute. *See* H.R.Conf.Rep. No. 576, 100th Cong., 1st Sess., *reprinted in* 1988 *U.S.Code Cong. & Admin.News* 1547, 1872. The report merely states that the conference agreement was identical to the House provision, which "clarifie[d] that the Trading with the Enemy Act and the International Emergency Economic Powers Act do not authorize regulations on the export or import of informational material not otherwise controlled under the Export Administration Act." *Id.* The conference report noted that the Senate amendment contained no provision relating to section 2502 of the trade act. *Id.*

Despite the conference report's brevity, the legislative intent behind new TWEA section 5(b)(4) may be discerned from a report of the House Committee on Foreign Affairs, which accompanied H.R. 3. *See* 1988 *U.S.Code Cong. & Admin.News* 1547 (listing various House reports related to Public Law 100–418). According to the Committee:

> The committee notes that the American Bar Association House of Delegates approved, in February 1985, the principle that no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment. That principle applies with equal force to the exportation of ideas and information from this country to the rest of the world. Accordingly, these sections also exempt informational materials and publications from the export restrictions that may be imposed under these acts.

H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 3, at 113 (1987).

*3. Regulatory Amendments.* After the 1988 TWEA amendment, OFAC amended its regulations to reflect the statutory change. *See* Cuban Asset Control Regulations, 54 Fed.Reg. 5229 (1989) (to be codified at 31 C.F.R. Pt. 515). The regulations became effective February 2, 1989. *Id.* at 5230.

Paralleling the statute, the new regulations completely exempt from prohibition or regulation "[t]he importation from any country, and the exportation to any country, whether commercial or otherwise, of informational materials, as defined in section 515.332." *Id.* § 515.206.

Section 515.332(a) then defines "informational materials," which the statute itself had not defined:

> For purposes of this part, the term "informational materials" means information recorded in tangible form, *i.e.*, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, and other tangible informational articles.

*Id.* § 515.332(a).

Again paralleling the statute, the regulation provides that "informational materials" do not include items controlled under the Export Administration Act of 1979 or prohibited by Title 18 of the United States Code. *Id.* § 515.332(b)(1).[9] Further, the regulation provides that "informational materials" do not include "[i]ntangible items, such as telecommunications transmissions." *Id.* § 515.332(b)(2).

Along with these new regulatory provisions, OFAC provided various examples of transactions permissible under the new regulations. These examples include a United States publisher that ships books from Cuba; an arrangement whereby a Cuban party exports the single master copy of a Cuban motion picture to the United States and thereafter sets up a li-

---

**8.** The only true exception to the general applicability of the legislative history of H.R. 3 is § 2404(a), involving a technical amendment to provisions dealing with the export of domestically produced crude oil. *See* Omnibus Trade and Competitiveness Act, Pub.L. No. 100–418, § 2(b)(1), 1988 *U.S.Code Cong. & Admin.News* (102 Stat.) 1107, 1119.

**9.** These prohibitions generally concern national security, in the export of technology or in espionage. *See supra* notes 6–7.

censing arrangement under which the U.S. party distributes, duplicates, and generally exploits the film; a U.S. recording company that contracts to purchase and import preexisting recordings by a Cuban musician or to copy the recordings in the United States and pay royalties; and a subpublication agreement licensing the right to public performance, adaptation and arrangement of a Cuban musical composition. *See id.* at 5233.

## IV.  ANALYSIS

### A.  *Statutory Construction and Legislative History*

■ Petitioners argue that the term "informational materials" as used in the amended TWEA and accompanying Regulations is premised on First Amendment principles and encompasses original works of art, thus exempting the acquisition of Cuban paintings from TWEA prohibition or regulation.  The government responds with two arguments:  first, that the TWEA amendment does not include all First Amendment activity; and, second, that original art is not "informational" but merely aesthetic and thus not exempt from the TWEA.

Certainly, "art" in the form of paintings is not expressly exempted under the amended statute.  The amended statutory language enumerates a list of other specific items now exempt from the TWEA, followed by the general words "and other informational materials."  *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2502(a)(1) (102 Stat.) 1107, 1371 (codified as amended at 50 U.S. C.A.App. § 5(b)(4)).

The general term "informational materials" first appeared in the 1988 amendment. Before 1988, the TWEA contained no specific exemptions from its prohibitions, and the accompanying regulations provided licenses for only a finite list of items, which did not include the general term "informational materials."  *See* 31 C.F.R. § 515.545.

Accordingly, the legislative history must be considered to determine what Congress intended when it used the term "informational materials."  In explaining the act, the House Foreign Affairs committee expressly noted that the American Bar Association House of Delegates, the ABA's representative body, had approved "the principle that no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment."  H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 3, at 113 (1987).

Artwork, like other forms of expression, is within the ambit of speech that receives First Amendment protection.  *See Serra v. U.S. General Services Administration,* 847 F.2d 1045, 1048 (2d Cir.1988); *Piarowski v. Illinois Community College District 515,* 759 F.2d 625 (7th Cir.1985), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985).  As the court in *Piarowski* stated:

> [T]he freedom of speech and of the press protected by the First Amendment has been interpreted to embrace purely artistic as well as political expression (and entertainment that falls far short of anyone's idea of "art," such as the topless dancing in *Doran v. Salem Inn., Inc.,* 422 U.S. 922, 932–34 [95 S.Ct. 2561, 2568–69, 45 L.Ed.2d 648] (1975)), unless the artistic expression is obscene in the legal sense.

*Piarowski,* 759 F.2d at 628.

The government concedes that artwork has First Amendment protection.  Government's Memorandum at 16 (citing *Serra,* 847 F.2d at 1048).[10]  Notwithstanding what

---

**10.** As discussed, the government claims that the amended TWEA does not reach to protect all First Amendment activity but only "informational materials."  Accordingly, the government argues that regulations that have an incidental effect on First Amendment freedoms can be justified by sufficiently important governmental interests in the non-speech elements of conduct. Government Memorandum at 16–17 (citing *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672, 679–80

(1968) (upholding law against burning of draft cards during Vietnam war)).  Further, economic regulation has been recognized as a sufficiently important governmental interest to allow for incidental effects on free expression. Government's Memorandum at 16 (citing *NAACP v. Clairborne Hardware Co.,* 458 U.S. 886, 912–15, 102 S.Ct. 3409, 3425–27, 73 L.Ed.2d 1215, 1235–37 (1982) (listing narrow situations in which such economic regulation allowed, while holding First Amendment protected non-

seems the clear import of the committee report, the government argues that the committee "only noted" the ABA recommendation and that if Congress truly intended to exempt all materials implicating the First Amendment, it would have done so. Government's Memorandum at 11.[11] The government offers no support for this argument, which seems to ignore the plain language of the report and the obvious First Amendment orientation of the words "informational materials."

Attempting to discount references to the First Amendment in the legislative history, the government retreats to the statutory language itself, arguing that "informational materials" is a more restricted category than of materials protected by the First Amendment. *Id.* at 11–12 (citing *Schad v.*

*Mount Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 2180, 68 L.Ed.2d 671 (1981)).[12] Specifically, the government argues that original works of art are not informational but limited to a mere aesthetic dimension. *See* Government's Memorandum at 11.

The government offers no support for this assertion, other than common sense. But common sense provides no support. Art conveys information through its unique form of expression, often political expression. For example, Eugene Delacroix celebrated liberty, equality, and fraternity in "Liberty Leading the People." Pablo Picasso decried the brutality of fascism in "Guernica." On a perhaps more everyday level, those who view political cartoons in daily newspapers are both targeted with a political message and impressed by the

violent expressive activities of black citizens who boycotted white businessmen)).

To support this argument, the government points to decisions under the TWEA or analogous statutes rendered before its 1988 amendment. *See* Government's Memorandum at 20–21 (citing *Teague v. Regional Commissioner of Customs,* 404 F.2d 441, 445 (2d Cir.1968), *cert. denied,* 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969) (regulations governing book imports from China and North Vietnam had only incidental First Amendment effect, with primary purpose to restrict dollar flow to hostile nations); *American Documentary Films, Inc. v. Secretary of Treasury,* 344 F.Supp. 703 (S.D.N.Y. 1972) (rejecting TWEA First Amendment challenge when government refused to issue retroactive license, because film distributor would not divulge sources of Cuban film)).

This court agrees with petitioners that these cases are distinguishable from the present. The courts rendering those decisions emphasized that the regulations involved made limited incursions on First Amendment activity and thus the restrictions involved were truly incidental.

In addition, these arguments totally miss the point of the 1988 TWEA amendment, which totally *exempts* from prohibition or regulation the import of ideas and information protected by the First Amendment. Through the 1988 amendment, Congress eliminated the sort of constitutional questions that arose in cases like *American Documentary Films* and *Teague.* The executive branch must exercise its powers under the TWEA in accordance with congressional intent. *See United States v. Frade,* 709 F.2d 1387, 1402 (11th Cir.1983).

**11.** Besides discounting references in the TWEA legislative history to the First Amendment, the government makes a second argument based on legislative history. The government notes that

the Committee report refers to exemption practices then current under the IEEPA as indicative of the circumscribed nature of the 1988 TWEA exemptions. Government's Memorandum at 12–13 and n. 8. The government did not enlighten the court as to exemption practices current under the IEEPA in 1988, but petitioners have demonstrated practices current under the TWEA before this controversy arose, including those of national auction houses. Furthermore, the government cites regulatory provisions promulgated before the IEEPA was amended in 1988 to exempt "informational materials." *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2502(b)(1), 1988 *U.S.Code Cong. & Admin.News* (102 Stat.) 1107, 1371 (codified as amended at 50 U.S.C.A. § 1702(b)(3) (Supp.1989)).

**12.** In making this argument, the government apparently relies on the canon of statutory construction known as *ejusdem generis.* According to that canon, when general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects sufficiently similar in nature to those objects enumerated. *Garcia v. United States,* 469 U.S. 70, 74, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984); *see generally* 2A *Sutherland Statutory Construction* § 47.17 (4th ed. 1984). However, the government's arguments as to why original art is dissimilar from the statutory enumerations are not persuasive. Furthermore, a statutory classification is defined by reference to a statute's subject and purpose, "viewed in terms of legislative intent or meaning to others." 2A *Sutherland Statutory Construction* § 47.18, at 177. *Ejusdem generis* cannot be applied in a vacuum, and this court must consider the circumstances surrounding enactment of the 1988 Amendment.

craftsmanship of a Herblock or Jeff McNelly.

That the paintings at issue here convey information is belied by the statements of the very persons who oppose their exhibition and auction at the Cuban Museum. The buyer of a painting at a museum auction, who later set it afire, announced that his act was one "of revulsion against Marxist–Leninist propaganda." *See* Appendix to Emergency Motion for Return of Property Pursuant to Rule 41(e) and Memorandum of Law in Support, at 7 ("Appendix"). Those who protested against the museum's auctions of Cuban art were photographed displaying placards that read "Art, Yes! Propaganda, No!" *Id.* at 7. Admittedly, those who view this art as propaganda would claim that it conveys skewed information. Yet, this is information nonetheless.

In contrast to the government's unsupported contention that art is only aesthetic, petitioner cites numerous authorities for the proposition that art is informational as well. *See generally* Appendix at 18.[13] Exemplary is a passage from a recent art history survey:

> Great works of art are more than aesthetically pleasing objects, more than feats of human skills and ingenuity: they deepen our insight into ourselves and others, they sharpen our awareness of our own and other religious beliefs, they enlarge our comprehension of alternative and often alien ways of life—in short they help us to explore and understand our own human nature.

H. Honour & J. Fleming, *The Visual Arts, A History* 15 (2d ed. 1986).

B. *OFAC Interpretation and Licensing Procedures*

The government argues that this court should abide by OFAC interpretation of the statutory amendments, as it is the agency charged with administering the TWEA. Government's Memorandum at 13. This court agrees that OFAC's decisions are entitled to great deference and should be reversed only if arbitrary and capricious. *See De Cuellar v. Brady,* 881 F.2d 1561, 1565 (11th Cir.1989). If OFAC's interpretations of TWEA provisions are reasonable, this court must not substitute its own construction of the statute. *Id.*

As evidence of OFAC's statutory interpretation, the government points to a September 1988 letter from an OFAC official, which purportedly interprets the amended TWEA to not exempt artwork as a class. *Id.* at 9 (citing Appendix at 20).

The court does not find the September 1988 OFAC letter a reasonable construction of the statute, for two reasons. First, the letter itself is nonsensical, notwithstanding the cogency the government has ascribed to it. In regard to Cuban-origin paintings, the letter states that OFAC "has not, and will not, interpret the term 'publication' to include artwork, as a class." Petitioners do not attempt to argue that artwork is a publication, so as to be exempt under the first enumerated item of the TWEA. Simply put, the OFAC letter fails to address the question, which is whether the general term "informational materials" included in the 1988 TWEA amendment encompasses artwork as a class, even though it is not specifically enumerated.

The second reason the 1988 letter constitutes an unreasonable interpretation of the TWEA is that the OFAC regulations themselves, published in February 1989, call for a more generous reading of the statute. *See* 54 Fed.Reg. at 5233. The new regulations enumerate what informational materials include, ending that enumeration with the words "and other informational articles." *See* 54 Fed.Reg. § 515.332(a)(1). OFAC provides various "examples" of now permitted transactions following the regulations, drawing from the list of exemplary categories in the regulations. Thus, the enumerative list in the Regulations seems merely exemplary and not exclusionary.

Indeed, it is difficult to see any crucial distinction between the instant case and

---

**13.** Appendix 18 contains J. Martinez, *The Role of Art as Tangible Informational Material* (June 1989) (available at Miami–Dade Community College) (unpublished manuscript). Although Professor Martinez may have prepared his manuscript for this litigation, the manuscript is persuasive nonetheless for its plethora of authorities in the field of art history.

that presented in Example 2, allowing a U.S. party to import the master copy of a Cuban film and license it for distribution and duplication. First, Example 2 appears to undercut the government's argument that allowing the importation of reproductive forms is sufficient to pass constitutional muster. *See* Government's Memorandum at 14, 20; Plaintiff's Reply at 7 and n. 4. Albeit, title does not pass to the American party in Example 2, but a "master" copy has been imported nonetheless. Despite the fact that title has not passed, substantial monies would pass to Cuba in exchange for the privilege of a licensing arrangement. In essence, the sole distinction between the situation presented in Example 2 and that of petitioners is that "film" is a specifically enumerated exemption within the 1988 amendment.

Beyond OFAC's statutory interpretation, agency action, or rather inaction, regarding Cernuda's licensing requests was arbitrary and capricious. Under procedures that existed even prior to the 1988 amendment, Cernuda could seek a permit for importing the Cuban artworks, for either educational or commercial purposes. *See* 31 C.F.R. § 515.545. On December 1, 1988, Cernuda wrote OFAC requesting permission to exhibit the works of a Cuban dissident artist who had been persecuted under Castro's regime. Petitioner's Memorandum at 12 and Appendix at 5. Cernuda expressed hopes that the exhibit would "serve to denounce the lack of freedom of expression and artistic freedom that prevails in Castro's Cuba." *Id.* OFAC never responded to Cernuda's letter. *Id.* at 13. Nor has it denied ever receiving the letter.

The government defends OFAC's failure to approve, or even respond to, Cernuda's request as being unnecessary. *See* Government's Memorandum at 17–18. According to the government, the museum was aware when it sought the permit that the exhibition of Cuban works did not require approval, although an auction of such works did. *Id.* and at n. 11. But the government cannot separate the sale and exhibition of the disputed paintings. If the paintings are not informational materials, they are subject to the TWEA and both their exhibition or auction is prohibited absent a license. On the other hand, if the paintings are informational materials, the government can regulate neither their exhibition nor auction under the 1988 TWEA amendment, which provides for the importation of such materials "whether commercial or otherwise." *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2502(a)(1), 1988 *U.S.Code Cong. & Admin.News* (102 Stat.) 1107, 1371 (codified as amended at 50 U.S.C.A. App. § 5(b)(4)). The government cannot have it both ways.

Nor was this the only instance of arbitrary OFAC behavior. Besides requesting a license to exhibit specific works, Cernuda also sought a retroactive license for his auctions of Cuban paintings during a visit to OFAC in late May 1989. *See* Petitioner's Memorandum at 14. Cernuda advised OFAC that he had not knowingly violated the TWEA, as required for a criminal violation to occur.[14] OFAC conceded that precedent existed for a retroactive license. *See* 31 C.F.R. §§ 515.203(c), 515.502. Nonetheless, OFAC also failed to respond in any meaningful way to this licensing request. Instead, in June 1989, OFAC's director delivered a speech to a group of Cuban Americans who had criticized Cernuda and the Cuban Museum, pledging to work with those who opposed the museum's activities. Petitioner's Memorandum at 14–15.

Such activity constitutes arbitrary and capricious action by the agency charged with evenhandedly administering a statute and its regulations. Considering such activity and the unreasonableness of OFAC interpretation of the TWEA, this court will not defer to that interpretation.

---

**14.** After the 1988 amendments, penalties for willful violation of the TWEA include a maximum fine of $50,000, maximum imprisonment of ten years, and forfeiture to the United States of property concerned in such violation. 50 U.S.C.A.App. § 16 (Supp.1989). To establish a violation of the TWEA, the government must prove that the defendant knew the applicable regulatory provisions existed at the time he violated them and that such violation was intentional. *See United States v. Frade*, 709 F.2d 1387, 1392 (11th Cir.1983).

Instead, the court holds that statutory construction and the legislative history of the 1988 TWEA amendment show that Congress amended the TWEA to exempt "informational materials," in order to prevent the statute from running afoul of the First Amendment. Original paintings fall within the statutory exemption.[15] This construction avoids serious questions about the constitutionality of the TWEA. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533, 541 (1979). Accordingly, this court need not reach the constitutional issues briefed by the parties in this case, following the axiom of abstention from constitutional decision-making when statutory interpretation suffices. *Id; Tagle v. Regan,* 643 F.2d 1058, 1067 (5th Cir.1981).

## VI. RETROACTIVITY OF THE 1988 AMENDMENT

While petitioner Cernuda's exhibition and auction of Cuban-origin paintings is exempt from the TWEA under its 1988 amendment, some question remains whether the amendment is retroactive so as to reach violations that may have occurred before its effective date.[16]

■ Retroactivity is generally not a favored concept. *See* Government's Memorandum at 15, n. 10 (citing *Bowen v. Georgetown University Hospital,* —— U.S. ——, 109 S.Ct. 468, 476, 102 L.Ed.2d 493, 500 (1988)). Therefore, congressional enactments and legislative regulations will not be considered retroactive unless their language so requires. *Bowen,* 109 S.Ct. at 476. Notwithstanding, this court agrees with petitioner that the 1988 TWEA amendment was intended to be retroactive. *See* Petitioner's Memorandum at 21–22. This is explicit in section 2502(a)(2) of the Omnibus Trade and Competitiveness Act of 1988:

The authorities conferred upon the President by Section 5(b) of the Trading With the Enemy Act *which were being exercised with respect to a country on July 1, 1977,* as a result of a national emergency declared by the President before such date, *and are being exercised on the date of the enactment of this Act, do not include the authority to regulate or prohibit any activity* [exempt as involving informational materials].

Omnibus Trade and Competitiveness Act, Pub.L. No. 100–418, § 2502(a)(2), 1988 *U.S. Code Cong. & Admin.News* (102 Stat.) 1107, 1371 (emphasis added).

The preamble to the new OFAC Regulations also indicates that the change is retroactive: "Under section 2502(a)(2) of the Trade Act, *the new limitation* on the President's authority under TWEA *applies to existing and future sanctions programs.* This rule makes revisions to the Regulations necessary to conform them to this new limitation on Presidential authority under TWEA." 54 Fed.Reg. at 5230 (emphasis added).

■ Furthermore, the law of this circuit provides that if a statutory change is definitional, the change is retroactive. *See United States v. Kolter,* 849 F.2d 541, 544 (11th Cir.1988).[17] The government attempts to argue that the 1988 amendment did not change the definition of property covered by the regulations but only removed certain classes of property from regulation. Government's Memorandum at 15 n. 10. The court agrees with petitioners that the government's characterization of the change wrought by the 1988 amendment is incredible, at best. *See* Petitioners' Reply to Government's Response to Motion For Return of Property, at 9 n. 5.

■ Accordingly, the court holds that the amended TWEA applies retroactively, so as to reach possible violations that occurred before 1988.

---

**15.** Admittedly, the general term "informational materials" may be construed to exempt other items besides paintings from the TWEA, as the government fears. *See* Government's Memorandum at 15. However, this petition presents only the question of whether paintings are exempt from the TWEA. No occasion exists to decide whether other "art" falls within the rubric of "informational materials."

**16.** For discussion of possible TWEA violations before its 1988 amendment, see *supra* note 4.

**17.** Petitioners argue correctly that the general savings clause, 1 U.S.C. § 109, which provides that repealing legislation must expressly provide for retroactive relief, only applies when a statute is repealed. *See Kolter,* 849 F.2d at 544.

## V. CONCLUSION

This case has turned on the construction of a statutory amendment. But not far beneath the surface of its language lies a constitutional principle central to American life and law: the First Amendment. As the Supreme Court has noted, "[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea because society finds the idea itself offensive or disagreeable." *See Texas v. Johnson,* —— U.S. ——, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (First Amendment protects even burning of American flag when done as means of political expression). This is true whether a large or small segment of society finds the idea offensive.

Admittedly, the principle enshrined in the First Amendment has been the root of bitter controversy and debate in this country, as in the *Johnson* case itself. Yet, that principle is one that courts and philosophers have considered fundamental to a free society. *See, e.g., New York Times v. Sullivan,* 376 U.S. 254, 279 n. 19, 84 S.Ct. 710, 725 n. 19, 11 L.Ed.2d 686, 706 n. 19 (1964) (quoting J.S. Mill, *On Liberty* (1st ed. 1859) ("[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error' ")).

Some in the community may dislike the information conveyed in the art exhibited and auctioned by the Cuban Museum. The museum may find that future support and funding may not be as forthcoming, if it continues to buck the wishes of those who helped found it. Nonetheless, that is not the affair of this court. Nor can the government dictate whether petitioners and the Cuban Museum may exhibit or auction paintings of Cuban origin. Such activity is not illegal. On the contrary, it is expression protected by the First Amendment and exempted from regulation under the 1988 amendment to the TWEA.

Accordingly, after careful consideration of this matter, it is hereby:

ORDERED AND ADJUDGED that the petitioner's petition be, and is, hereby GRANTED, and that the U.S. Customs Service is ordered to return the remaining property seized from Mr. Cernuda to him forthwith.

DONE AND ORDERED.