**Masood KALANTARI, an individual and a California resident, Plaintiff–Appellant,**

v.

**NITV, INC., a California corporation d/b/a/National Iranian TV; Zia Atabay, a/k/a Zia Atabai, an individual; Parvin Atabay, a/k/a Parvin Atabai, an individual; Lobecast North America, Inc., a Delaware corporation; and Does 1–10, Defendants–Appellees.**

No. 02–56592.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 2003.

Filed Dec. 12, 2003.

---

Ali Kamarei, Palo Alto, California, for the plaintiff-appellant.

Martin N. Refkin, Gallagher & Gallagher, PC, Los Angeles, California, for the defendants-appellees.

Before B. FLETCHER, RYMER, and GRABER, Circuit Judges.

## OPINION

GRABER, Circuit Judge.

In this copyright infringement case, we are called on to decide whether the Iranian trade embargo, *see* 31 C.F.R. Part 560, prohibits the commercial importation of movies from Iran, the copyright of such movies, or the assignment to a "United States person" of the exclusive rights to copyright, distribute, and exhibit the movies in North America. We answer "no" to each of those questions and, accordingly, we reverse.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Masood Kalantari is a producer of television programs and a promoter of Iranian cultural events in the United States. He is a "United States person," 31 C.F.R. § 560.314, who is subject to the Iranian trade embargo, *see, e.g., id.* §§ 560.201–560.209.

Under a series of agreements, Plaintiff acquired the rights to three Farsi language films—"Snow Man," "Two Women," and "Corrupted Hands"—from their Iranian owners. For each film, Plaintiff's contract consists of an "Assignment," in English, and a "Contract," in Farsi. In relevant part, the agreements provide that, for a specified term: (1) Plaintiff is assigned, exclusively, all rights to the films, including the exclusive rights to

copyright, distribute, and exhibit the films within the United States and Canada; (2) Plaintiff agrees to copyright the films in the United States and to use his "utmost efforts" to show and advertise the films; (3) the films' owners agree to send Plaintiff copies of the films and advertising materials; and (4) Plaintiff agrees to pay (a) for "Snow Man" and "Two Women," an initial deposit of $10,000, followed by quarterly payments of 50 percent of the net profit from showing the films, and (b) for "Corrupted Hands," three installment payments amounting to roughly $13,000.

As agreed, Plaintiff has made the contractual payments and displayed the three films in the United States. Plaintiff has also obtained copyright registrations for all three films.[1] Each copyright certificate lists the Iranian owner as the author of the work and indicates that Plaintiff became the owner of the copyright by way of an assignment of rights.

After Defendants NITV, Inc., d/b/a National Iranian TV, Zia Atabay, and Parvin Atabay allegedly broadcast the three movies on television in the United States without authorization, Plaintiff brought this action against them for copyright infringement. Defendants moved for summary judgment on the sole ground that the Ira-

nian trade embargo prohibited Plaintiff from purchasing the rights that he purports to possess and that, without a valid assignment, he cannot have a valid copyright that could be infringed. The district court granted Defendants' motion. Plaintiff brought this timely appeal.

### STANDARD OF REVIEW

▮ We review de novo a grant of summary judgment. *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir.2002) (en banc), *cert. denied*, 538 U.S. 922, 123 S.Ct. 1573, 155 L.Ed.2d 313 (2003). We also review de novo the district court's interpretation of federal statutes and regulations. *Boise Cascade Corp. v. United States*, 329 F.3d 751, 754 (9th Cir.2003).

### DISCUSSION

A. *IEEPA and the Informational Materials Exemption*

The International Emergency Economic Powers Act ("IEEPA"), enacted in 1977, gives the President the authority to "investigate, regulate, or prohibit ... any transactions in foreign exchange" upon declaring an emergency based on a foreign threat.[2] 50 U.S.C. §§ 1701, 1702(a)(1)(A).

---

1. The Berne Convention allows copyright registration in member countries (including the United States) of works from nonmember countries (including Iran) if publication in the member country is simultaneous with first publication in the nonmember country of origin. Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, art. 3(1)(b); *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 17.04[D][2], at 17–31 to 17–37 (2003). "Publication," in the case of a motion picture, includes offering to distribute copies for the purpose of public showing in theaters. 1 Nimmer § 4.11[A], at 4–56; Berne Convention art. 3(3). Plaintiff acquired United States copyrights for the films under this theory of simultaneous first publication.

2. IEEPA is a modification of the Trading With the Enemy Act ("TWEA"), which was enacted in 1917. In 1977, Congress moved the President's *peacetime* authority from TWEA to the newly created IEEPA. Pub. L. No. 95–223, 91 Stat. 1625 (1977). TWEA now delineates the President's authority during wartime, *see* 50 U.S.C. app. § 5 (1988), whereas IEEPA powers may be exercised without a declaration of war. However, a grandfather clause in the 1977 amendment allowed for the continuation of peacetime economic measures taken pursuant to TWEA before 1977. Pub. L. No. 95–223, § 101(b). Therefore, the embargo against Cuba, which began in 1962, is governed by TWEA. *Cernuda v. Heavey*, 720 F.Supp. 1544, 1546–47 (S.D.Fla.1989).

However, the President lacks the authority under IEEPA to regulate information and informational materials:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—
>
> . . . .
>
> (3) the importation from any country, . . . whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD–ROMs, artworks, and news wire feeds.

*Id.* § 1702(b)(3).

█ Congress added the foregoing exemption for informational materials to IEEPA in 1988, in what is known as the "Berman Amendment." *See Capital Cities/ABC, Inc. v. Brady,* 740 F.Supp. 1007, 1009 (S.D.N.Y.1990).[3] The Berman Amendment was designed to prevent the executive branch from restricting the international flow of materials protected by the First Amendment. *Cernuda v. Heavey,* 720 F.Supp. 1544, 1548 (S.D.Fla.1989) (quoting H.R.Rep. No. 100–40, pt. 3, at 113 (1987)).[4] The Berman Amendment has been described as a reaction to several seizures by the United States of shipments of magazines and books from embargoed countries[5] and to the Treasury Depart-

ment's restrictions on the permissible forms of payment for informational materials purchased from Cuba.[6]

The IEEPA exemption was expanded in a 1994 amendment entitled "Free Trade in Ideas."[7] The 1994 amendment expanded the exemption's nonexclusive list of informational materials to include new media, such as compact discs and CD ROMs, and it clarified that the exemption applied to importation and exportation in any "format or medium of transmission." The House Conference Report stated:

> The language [of the original 1988 exemption] was explicitly intended, by including the words "directly or indirectly," to have a broad scope. However, the Treasury Department has narrowly and restrictively interpreted the language in ways not originally intended. The present amendment is only intended to address some of those restrictive interpretations, for example limits on the type of information that is protected or on the medium or method of transmitting the information.
>
> The committee of conference intends these amendments to facilitate transactions and activities incident to the flow of information and informational materials . . . .

H.R. Conf. Rep. No. 103–482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483.

---

3. The amendment added identical text to IEEPA and TWEA. Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2502, 102 Stat. 1107 (1988).

4. *Cernuda* involves the trade embargo against Cuba and thus discusses the history of the Berman Amendment in the context of TWEA. *See supra* notes 2 and 3.

5. Laura A. Michalec, Note, *Trade With Cuba Under the Trading With the Enemy Act: A Free Flow of Ideas and Information?,* 15 Fordham

Int'l L.J. 808, 816–19 & nn. 53–57 (1991/1992) (describing the history of the Berman Amendment).

6. *See Walsh v. Brady,* 927 F.2d 1229, 1230 (D.C.Cir.1991) (stating that the 1988 amendment sought to remove the Treasury Department's indirect ban on the importation of informational materials from Cuba).

7. Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, Pub. L. No. 103–236, § 525, 108 Stat. 382 (1994).

B. *The Iranian Trade Embargo*

Pursuant to his authority under IEEPA, President Clinton issued Executive Order Nos. 12959 and 13059, in 1995 and 1997 (respectively), to prohibit most trade with Iran. 60 Fed. Reg. 24757 (May 9, 1995); 62 Fed. Reg. 44531 (Aug. 21, 1997). The Iranian trade embargo was intended "to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" presented by "the actions and policies of the Government of Iran." Exec. Order No. 12959, 60 Fed. Reg. at 24757; Exec. Order No. 12957, 60 Fed. Reg. 14615, 14615 (Mar. 17, 1995); *see also* Exec. Order No. 13059, 62 Fed. Reg. at 44531. As the Fourth Circuit has stated:

> The obvious purpose of [Executive Order No. 12959] is to isolate Iran from trade with the United States.
>
> ... [Executive Order No. 12959] reflected the President's appraisal of the nation's interest in sanctioning Iran's sponsorship of international terrorism, its frustration of the Middle East peace process, and its pursuit of weapons of mass destruction.

*United States v. Ehsan*, 163 F.3d 855, 859 (4th Cir.1998) (citing Message to Congress on Iran, 31 Weekly Comp. Pres. Doc. 1584 (Sept. 25, 1995)).

The President's Executive Orders have largely been codified in the Iranian Transactions Regulations, 31 C.F.R. Part 560, which prohibit, with few exceptions, "the importation into the United States of any goods or services of Iranian origin" and any "transaction or dealing in" such goods or services, *id.* §§ 560.201 and 560.206.

Notwithstanding their broad scope, however, the regulations permit trade in certain items through general and specific licenses, and they reflect the IEEPA exemption for informational materials:

> The importation from any country ... of information and informational materials as defined in § 560.315, whether commercial or otherwise, regardless of format or medium of transmission, [is] exempt from the prohibitions and regulations of this part.

*Id.* § 560.210(c)(1).

1. *Importation*

■ The first question that we must answer is whether Plaintiff's importation of the three movies ran afoul of the Iranian embargo. It is clear from the text of the statute and regulation that the bare importation of a movie is permitted. 50 U.S.C. § 1702(b)(3); 31 C.F.R. § 560.210(c)(1). But, because Plaintiff paid Iranians for the movies that he imported, to answer our first question, we also must consider whether a commercial transaction that results in importation is likewise permitted.

The regulation provides, as relevant: "The importation from any country ... of information and informational materials ..., whether commercial or otherwise ..., [is] exempt from the prohibitions and regulations of this part." Grammatically, the noun that the clause "whether commercial or otherwise" modifies is "importation." This reading squares, too, with the statutory text from which the regulations drew the modifier. In 50 U.S.C. § 1702(b)(3)— the IEEPA exemption—the phrase "commercial or otherwise" directly follows the importation/exportation clauses, and quite clearly modifies them. *Cf. Ehsan*, 163 F.3d at 858 (suggesting that the term "exportation" in the context of the Iranian embargo, even without a modifier, implies trade or commercial activity).

We note that the result would be the same if the phrase "whether commercial or otherwise" modified, instead, "information and informational materials." The importation of commercial materials, similarly, suggests that the materials will continue to have a commercial use after importation.

We pause here to define "commercial." It means, "of, in, or relating to commerce" or "from the point of view of profit[, as,] having profit as the primary aim." Webster's Third New Int'l Dictionary 456 (unabridged ed. 1993). "Commerce," in turn, is defined as, "the exchange or buying and selling of commodities." *Id.* In short, the importation of a movie for which a United States person paid is permitted.

In summary, the exemption plainly allows a United States person to pay Iranians in exchange for the importation of a movie.

### 2. *Copyright*

The applicable regulations grant an express general license for certain transactions related to intellectual property protection in the United States or Iran:

All of the following transactions in connection with patent, trademark, copyright or other intellectual property protection in the United States or Iran are authorized:

(1) The filing and prosecution of any application to obtain a patent, trademark, copyright or other form of intellectual property protection, including importation of or dealing in Iranian-origin services, payment for such services, and payment to persons in Iran directly connected to such intellectual property protection;

(2) The receipt of a patent, trademark, copyright or other form of intellectual property protection;

(3) The renewal or maintenance of a patent, trademark, copyright or other form of intellectual property protection; and

(4) The filing and prosecution of opposition or infringement proceedings with respect to a patent, trademark, copyright or other form of intellectual property protection, or the entrance of a defense to any such proceedings.

31 C.F.R. § 560.509(a).

Without question, then, an Iranian movie may be copyrighted in the United States. The narrow question here is whether an assignee may copyright a lawfully imported Iranian movie in view of the absence of "assignment" from the foregoing list of authorized copyright transactions.

### 3. *Assignment*

■ In addition to exempting informational materials, the Iranian Transactions Regulations permit trade in some items by way of general licenses.[8] When the regulations license a transaction, they also authorize "[a]ny transaction ordinarily incident to [that] licensed transaction and necessary to give effect thereto." 31 C.F.R. § 560.405.

As discussed above, an Iranian author may copyright a film in the United States, pursuant to a general license. Thus, any transaction "ordinarily incident to [the copyright] and necessary to give effect thereto" is permitted, unless specifically prohibited by another regulation. For the following reasons, we hold that a copyright assignment is an incidental transaction authorized by 31 C.F.R. § 560.405 and not prohibited by any other regulation.

■ Upon obtaining a copyright, an author automatically acquires certain rights that are inherent in the very nature of a copyright. Specifically, the copyright owner obtains the six exclusive rights of copyright, 17 U.S.C. § 106, as well as the right to transfer any or all of those rights: "The

---

**8.** For example, the importation of Iranian carpets is allowed, not as an *exemption,* but as one of several general *licenses* granted in Subpart E, 31 C.F.R. Part 560. 31 C.F.R. § 560.534.

**1208**

ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law. . . ." *Id.* § 201(d)(1). Without question, an assignment qualifies as a transfer by "any means of conveyance."

■ The basic rights inherent in a copyright do not change simply because a movie's original owner is an Iranian who is expressly authorized to obtain the copyright. With the general license to obtain a copyright, *id.* § 560.509, Iranians as well as Americans obtain the right to transfer the copyright freely, by assignment or otherwise. Thus, because the right to assign a copyright is part of the bundle of rights inherent in holding a copyright, an assignment is a transaction "ordinarily incident" to ownership of a copyright and "necessary to give effect" to that ownership. *See* 31 C.F.R. § 560.405.

Nothing in the regulations suggests that this particular incidental transaction is not authorized by 31 C.F.R. § 560.405. It is true that the regulations that grant general licenses sometimes define related transactions that are impermissible notwithstanding § 560.405.[9] The regulation exempting informational materials, too, carves out certain types of related transactions that are impermissible despite the general exemption:

This section does not exempt from regulation or authorize transactions related [(1)] to information and informational materials not fully created and in existence at the date of the transactions, or [(2)] to the substantive or artistic alteration or enhancement of informational materials, or [(3)] to the provision of marketing and business consulting services.

31 C.F.R. § 560.210(c)(2) (numbering added). The subsection goes on to give a

nonexhaustive list of examples of transactions that would fall within this proscription:

Transactions that are prohibited notwithstanding[the exemption] include, but are not limited to, payment of advances for information and informational materials not yet created and completed (with the exception of prepaid subscriptions for widely circulated magazines and other periodical publications), and provision of services to market, produce or co-produce, create or assist in the creation of information and informational materials.

*Id.*

The assignment of a copyright to a completed movie is not listed there. Moreover, the delineation of certain still-prohibited incidental transactions implies that all *other* incidental transactions under § 560.405 are permissible under the exemption. The history of the IEEPA exemption and of § 560.210(c)(2) supports this understanding.

The House Conference Report on the 1994 amendment to the IEEPA exemption explicitly states that Congress intended to permit related transactions:

The committee of conference further understands that it was not necessary to include any explicit reference in the statutory language to "transactions incident" to the importation or exportation of information or informational materials, because *the conferees believe that such transactions are covered by the statutory language.*

H.R. Conf. Rep. No. 103–482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483 (emphasis added).

Furthermore, the history of § 560.210(c)(2) makes sense when viewed

---

**9.** For example, a person may buy an Iranian carpet, but may not accomplish the deal by

crediting an account belonging to the Government of Iran. 31 C.F.R. § 560.534(d), (e).

against the background of the House Report's understanding of the exemption. After the embargo began in May 1995, but before the Iranian Transactions Regulations were first issued in September 1995, the Office of Foreign Assets Control published its interim general licenses to provide guidance to the public in interpreting the Executive Orders. 60 Fed. Reg. 40881 (Aug. 10, 1995). General License No. 5 permitted the import and export of informational materials, as well as authorizing *"[a]ll financial and other transactions related to* the importation or exportation of information and informational materials." *Id.* at 40885 (emphasis added).

In the final regulations, which were issued one month later,[10] § 560.210(c)(2) described certain types of transactions that the informational materials exemption did not authorize and provided a list of examples of the still impermissible transactions. 60 Fed. Reg. 47061 (Sept. 11, 1995). In April 1999, this list of examples was augmented to prohibit the "payment of royalties to persons in Iran." 64 Fed. Reg. 20168, 20171 (Apr. 26, 1999). But in November 1999, the prohibition on "payment of royalties to persons in Iran" was deleted from the list, leaving the regulations in their current form. 64 Fed. Reg. 58789, 58791 (Nov. 1, 1999). It thus appears that, with the understanding that most incidental transactions were permitted, the agency identified a limited set of transactions that did not fall within the general rule. As we have noted, a copyright assignment does not fall within this set of prohibited transactions.

■ Analogous regulations also support our reading of the Iranian regulations. Because the IEEPA exemption for informational materials is a general limitation on the President's authority, it applies to all U.S. trade embargoes.[11] Not surprisingly, then, the text of the informational materials exemption to the Cuban embargo is substantially the same as that in the Iranian regulations. *Compare* 31 C.F.R. § 515.206 ("Exempt transactions") *with id.* § 560.210 (same). The Cuban regulations provide guidance in interpreting the exemption by giving several examples applying the regulations to common situations. One of these examples shows that the transfer of intellectual property rights is permitted under the exemption:

> *Example # 2:* A Cuban party exports a single master copy of a Cuban motion picture to a U.S. party and licenses the U.S. party to duplicate, distribute, show and exploit in the United States the Cuban film ... for five years, with the Cuban party receiving 40% of the net income. All transactions relating to the activities described in this example are authorized ....

31 C.F.R. § 515.206(a)(4). The payment of a percentage of net profits for the use of intellectual property, as described in the example, is a royalty.[12] This example is thus consistent with the *deletion* of "payment of royalties" from the list of *prohibited* transactions under the Iranian embargo.

In summary, agreements by which Iranians assign intellectual property rights

10. The President reported that the regulations "incorporate[d], with some modifications," the general licenses. Message to Congress on Iran, 31 Weekly Comp. Pres. Doc. 1584, 1586 (Sept. 25, 1995).

11. *See supra* notes 2 and 3.

12. A "royalty" is a

[c]ompensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the property.... A payment which is made to an author or composer by an assignee, licensee or copyright holder in respect of each copy of his work which is sold....

Black's Law Dictionary 1330 (6th ed. *1990*).

in a movie to a United States person are "ordinarily incident" to the importation and copyright of the film and are "necessary to give effect thereto." These agreements are incidental transactions permitted by 31 C.F.R. § 560.405 and not prohibited by 31 C.F.R. § 560.210(c)(2).

### CONCLUSION

The Iranian embargo does not prohibit the commercial importation of an Iranian movie, the copyrighting of the movie, or the assignment to a United States person of rights to obtain and enforce such a copyright. Therefore, the district court erred in holding that Plaintiff lacked a valid assignment or lacked authority to obtain a valid copyright.

REVERSED and REMANDED for further proceedings consistent with this opinion.